is very familiar with ADA preemption issues. Yes, we are. So I won't give a tutorial on that. What I will say is that we don't have, unfortunately, any guidance as to Judge Young's thinking in his conclusion that this case, which is, I would suggest, perhaps sui generis, falls within the rule put down in recent cases of this Court, like Bauer and Brown and others. And all we have, the only analysis we have from Judge Young, is the transcript of the summary judgment hearing. And he says at page 542 of the appendix, how are you going to deal with Bauer? That binds me. And then counsel responds, and the judge replies, respectfully, I think Bauer does apply, and I am compelled to rule that the action is preempted. What we don't know from that brief description by Judge Young of his thinking is what analysis he's done of the things that need to be looked at to determine if preemption does apply. Is there really the linkage? Counsel, with all due respect, it doesn't seem to me that's a good use of your time. We have de novo review here, so why don't you tell us why the result that Judge Young reached was wrong, instead of criticizing the lack of analysis that went into it. Yes, Your Honor, I will do that. I didn't mean to criticize Judge Young. No, that's not the point. The point is that we're on de novo review. You say that these claims are not preempted. The district court said they were. Tell us why the district court was wrong. Let me get you started. Bauer says your ordinary common law claims survive preemption. Bauer also says that on the facts of that case, the real burden would be imposed on the airlines, and therefore it's preempted. This is a case that isn't exactly like Bauer. It isn't exactly like the FedEx driver has to drive carefully and can't run through stop signs and the like. What is it about this case that makes it more like the common law case, which is not preempted?  One of the things the courts have done in doing the analysis of whether or not a common law case is preempted or is not preempted is to look to what's the result of lack of preemption, if you will. What kind of burden will be placed upon the carrier or the carriers? What effect on the regulatory process would it have if we were to allow this case to proceed? All right, so what's the burden? Frankly, Your Honor, I don't see that allowing this case to proceed would put any burden on the regulatory system or the lack of regulation that the ADA seeked to create. Or at least that no record of such a burden had been created before the district court. Absolutely not. There's absolutely nothing before the district court or in the appendix before this court to show that such a burden would be. The only thing that we see is a list of hypothetical, maybe we would have to do this in FedEx's brief. If this case were allowed to go forward, maybe we'd have to be more careful in how we deliver things. That's the essence of it. Let me ask you about this. Isn't that precisely what your claim is? They're in the business of using airplanes and other means, walking and trucking, to get a package from point A to point B, presumably with accuracy. Your claim, as I understand it, is that they didn't get it to point B. They got it to your client instead. My claim has nothing to do with it not getting to point B. My claim is my client is a stranger to this transaction. My client wasn't asking for any service from FedEx. Let me ask you this. To avoid liability, to make sure that this didn't happen, aren't you, in effect, asking a jury to rule that they would have had to exercise some greater care somewhere in the process between when the package was dropped off and delivered to make sure that it didn't get misdirected? Yes, Your Honor. I think it's fair to say that. But I suggest that that's not any different from the airline that can be sued for mismanaging somebody getting on and getting off the plane and injuring themselves. How about getting them on the wrong plane and taking them or flying them to the wrong destination? Could you sue someone because they let me get on a plane with my Portland, Maine ticket, and they let me get on the Portland, Oregon plane, and I say Delta should have been more careful? Could I sue them for that? You know what? Frankly, I don't know if there are any cases on that. It sounds to me like that probably falls within the rubric of services. But you'd have to analyze what's it going to impose on them. Mr. Fitzpatrick, may I clarify something? I thought your claim had two components because it's a Privacy Act claim. The first is the package gets delivered to your client when it shouldn't have been and that somehow the recipient, the purported recipient who didn't get the package, was given information about where the package was. Maybe they went online, they had a tracking number, and they were able to find out. And that the constellation of those two events, those two sort of failures by FedEx, are what give you a Privacy Act claim. Yes, Your Honor. We have both Privacy Act claims and tort claims. And certainly the fact that we think the record supports the allegation that the dealer, as we call them in our brief, one of the parties involved with the dealer called FedEx, spoke with someone at FedEx, and that someone at FedEx gave the person sufficient information that the dealer's comrades were then able to go to the house and seek to intimidate Mrs. Tobin. The main point that I would emphasize here, Your Honor, is that there has not been any argument made by FedEx, and there certainly was nothing in the record below to show that this, if I can call it unique circumstance, that is a person who has nothing to do with FedEx, has FedEx intruded on their lives, that allowing a person to bring a claim on that would open the gates, would open the floodgates to burden FedEx with the kinds of obligations that the Bauer court found would arise if they allowed that case to go forward. Well, here's what I suppose your opponent's argument is going to be. A core part of FedEx's business model is the delivery of packages. An essential element of your claim against FedEx is that the package was, in this case, was mislabeled and or misdelivered. That if we allow claims for mislabeling and misdelivery of packages, that will have an impact, a burden, on their services. And I'm not saying that they've properly made a record on that, but I'm saying that's the argument you've got to confront. You know, I suppose they would make that argument. I frankly think that they've got some obligation, if they're going to make that argument, to make some kind of a showing to support that argument, and there's been no such showing. I would also – I'm sorry, Your Honor. I said that may be correct, but where does that lead you? Does that lead you to a remand to the district court to give them an opportunity to make that showing? I think, Your Honor, if they had the ability to make that showing, they could have made it below, and if they didn't, they haven't made the kind of showing that shows that they're entitled to preemption. Obviously, this case goes back below if you agree with me that there wasn't preemption, because there was never a final resolution of the claims anyway. I would just point out finally, Your Honor, that this whole idea of service versus operations, for instance, is a very slippery one. The courts have acknowledged that it's very hard to determine. If you look at the sealed appendix, the last thing that was filed with this court was the sealed appendix, and it's FedEx's operations manual or portions of FedEx's operations manual, and they describe the process of delivering the package to the house as part of their operations rather than a service. So what those terms mean is anybody's guess, but in this case, Your Honor, there has not been enough showing that preemption is necessary or that this case is out of the realm of the ordinary court case. Thank you. Thank you. Good morning, Your Honors. May it please the court, I'm Trey Sutherland on behalf of Federal Express. Your Honors, I'd like to address quickly a couple of items that the court just inquired about. In terms of the giving out of information that's alleged in the appellant's brief in this case, that never happened. I'm sorry. If somehow, how else could the drug dealers have found out where the package was? Did one of them follow the truck all the way? Your Honor, to answer your question, there's nothing in the record to reflect that any information was given out by FedEx. Obviously. They got the information somehow. There may not be evidence, but if we're drawing inferences, I would draw an inference that FedEx was the source of the information, either directly or indirectly or going online. And as I said, I do think of the case as not just a misdelivery of a package, but providing information about the house to which it was misdelivered, which then resulted in the mischief which happened. You say there's nothing in the record. Your Honor, and the reason there's nothing in the record, and unfortunately my counsel opted here, was not a participant in any of the discovery that took place. The appellants in this case deposed every person that had anything to do with this shipment. Every person at FedEx. Not one of those people corroborated that allegation. Did they ask the drug dealer how they got the address? Your Honor, I understand. Did you? We did not, Your Honor. But as far as the online information, they were not satisfied with that testimony. They went further. They asked to depose our IT personnel, and our IT personnel made it very clear to the appellants that there was no way that these people that they called dealers, who Ms. Tobin actually called a young kid, that there was no way that they could have gotten that information offline, online, without having certain information. They did not have that. The tracking number? The tracking number is not enough, Your Honor. You have to have, there's a verification procedure at FedEx. There are several steps you have to go through. They did not have the information to pass that verification procedure. I'm not concerned about them. I'm concerned about the drug dealer who is expecting a shipment from someone who has a tracking number. Yes, Your Honor. The dealers did not have, the alleged dealers, the kids, did not have that information either. How do we know that? Because there are certain steps, Your Honor, that have to be required, that have to be followed. You have to have a tracking number. You have to have, there are several steps, and each of those steps has to be satisfied. The shipper, in this case, would not have had enough information to retrieve that information offline. It simply could not happen. And that, in the record, is very clear on that. Okay, well, I'll look at the record. So if a person gives FedEx a package and then finds out it never got delivered to the address, they can't call up on the phone and say, what happened? They can do that, Your Honor, and I think the distinction that needs to be made, they can find out whether or not a package has been delivered or not. They cannot find the address, and that is the key. You can look, you can type in a tracking number at FedEx, FedEx.com, and it will tell you delivered or not delivered or on its way or on a truck, but it will never provide to you the delivery address, and that is the case here. They were never provided the delivery address because they didn't have the information to get it. Was there any evidence that before the punitive drug dealers showed up at the house to pick it up, that FedEx knew that the package contained marijuana? Absolutely not, Your Honor. We had no idea. In fact, we did not know until after we received a call from the police. Did you know a package had been misdelivered? We found out that the package had been misdelivered at the same time we found out about the contents And what's the timing between when the police called and when the individual showed up at the house? Within a couple of hours, I believe, Your Honor. I don't have the exact timeline, but it was a couple of hours. Which way? The package was delivered within a couple of hours. What Ms. Tobin described was as a young kid appeared. And then when was the call made to FedEx in that sequence? Before. Before the kid arrived? Before the kid arrived, that is correct, Your Honor. So FedEx did know that the package had been misdelivered? And where it was. We did, Your Honor. And so how did the dealer get the information? Well, Your Honor, they did not get it from FedEx. And we have to deal with the record here. The record is clear. They could not have gotten it from FedEx. Counsel, I know it's perilous to use anecdotal information, but I happen to be a rather persistent FedEx customer because I often have materials shipped from my chambers to my home, which is some distance away. And occasionally I'll be expecting a package and I will call, give the tracking number. I will be told that the package has been delivered, not misdelivered, delivered. And I will say, well, I don't have it. Are you sure? And they will say, yes, that package was delivered at such and such a time to you at 1 Belmont Road and left at the guardhouse, right? So why wouldn't, if someone had the tracking number, why wouldn't he get that response if you thought the package was, FedEx thought the package was correctly delivered, be told, yes, that package has been delivered and given the time and the place. That's what, I mean, that's been my experience with FedEx. Your Honor, FedEx is not going to give out the delivery address. It will say that the package has been delivered. It will not provide the actual address. Except Judge Selye has just told you of his personal experience, which may be contrary to your policy, and what happened in this case may be contrary to your policy. And maybe that's a good defense, but it does suggest that there may be a common law breach here. Well, let me change focus a moment, Your Honor. The record does not reflect that information was given out by FedEx. Nevertheless, this Court has had the occasion to address the Airline Deregulation Act four times since 2007. Each time this Court has found preemption because it favors a broad preemptive sweep of that language. Now in the lower court, the District Court focused on the Bower case because that's the case that we presented. These arguments talking about service and things of that nature now, that never came up to the very end of the case because I actually showed the attorney for the appellants in this case the case law from this court that said, look, you cannot proceed this way. We actually asserted that affirmative defense, the ADA, in our answer. They didn't even look at it until the end of the case. And so now the threat of this appeal is that, guess what? We're going to create new law, new third-party law, and that's the whole point here. Well, one doesn't need to accept their third-party argument on de novo review. I think there are some other factors here that ought to be considered. Well, Your Honor, let's move even away from Bower. There's even a better example than Bower, and it came out of this court. It's called the Roe case, Roe v. New Hampshire Motor Transport Association. That case came out of this court. This court found preemption in that case. It was appealed to the United States Supreme Court, and the Supreme Court found preemption unanimously there. That case is important because, one, it came out of this court from a presidential standpoint. Secondly, it dealt with the very issues that this case deals with. One, delivery service procedures. The counsel opposite said, well, the sealed appendix talks about our procedures. They are putting our procedures in issue in this case. Secondly, it dealt with civil liability in relation to those procedures. In this fact, the appellants are asking for $900,000. The Roe court had this to say. It said, in regulating delivery service procedures, the recipient verification provision focused on carrier services, thereby creating a direct connection with motor carrier services, which had a significant and adverse impact on the congressional goal of precluding state regulation in lieu of competitive market forces. It went on to say that the main law thereby produces the very effect that the federal law sought to avoid, a state's direct substitution of its own governmental commands for competitive market forces. So Roe, even better than Bauer, is a better case for this court to sink its teeth into. I have another factual question about the record. The manager of the local FedEx place said, in essence, gosh, this is the first time this has happened in 29 years of service. And I take it what he meant was that there were two different address labels with different addresses on it. And then you put in some evidence that said basically people reuse their boxes and their old labels and then there's the new label. This is a common occurrence for us, and we've dealt with it. But is it common for FedEx itself to generate two labels, or I guess FedEx accepted a label and then generated a new label at a different address, and both of those are on the package? This goes, if you will, to the burdensomeness of these sorts of lawsuits. Well, Your Honor, the answer to that question is yes, that is common for a second label. No, no, that was not my – I'm sorry. The second label is generated by FedEx and put on the package with the label with the intended addressee. It's FedEx which created this problem. It's not – two label is not an accurate description of what happened here. I'm sorry, and I misunderstood. Yes, FedEx did in fact put the second label on there. The reason it put the second label on there, Your Honor, is because that label that we call a thermal label, it contains different information. It helps us better track and maintain those packages. And so in times past, we did all the time use the handwritten error bills. FedEx is moving away from that from a capturing information type perspective. And so, yes, we do put those labels on there in hopes of being more accurate. Unfortunately, in this case, we weren't. How often has this case happened? I'm not aware of any other case like this, Your Honor. Okay. Thank you.